RICHARD W. LEASE AND GOLDIE E. LEASE, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Lease v. Commissioner
Docket No. 7895-91
United States Tax Court
T.C. Memo 1993-493; 1993 Tax Ct. Memo LEXIS 501; 66 T.C.M. (CCH) 1121; October 26, 1993, Filed *501 Decision will be entered for respondent. Richard W. Lease and Goldie E. Lease, pro sese. For respondent: Trevor T. Wetherington. BEGHE
BEGHE
MEMORANDUM FINDINGS OF FACT AND OPINION BEGHE, Judge: Respondent determined deficiencies in petitioners' 1985 and 1986 Federal income taxes of $ 48,487.65 and $ 17,317.67, respectively. Petitioners, on their 1985 Federal income tax return, claimed a $ 295,618 deduction from ordinary income attributable to a business bad debt. This claimed deduction resulted in a net operating loss, which petitioners elected to forgo as a carryback and claimed as a net operating loss carryover on their 1986 return. Respondent disallowed these ordinary losses, allowing the 1985 loss as a capital loss, which gave rise to a $ 3,000 deduction from ordinary income under section 1211 [1] and another $ 3,000 deduction under section 1212 from ordinary income in 1986 as a capital loss carryover. The resulting increases in adjusted gross income generate correlative disallowances of medical expense deductions for 1985 and 1986 and a liability for 1986 self-employment tax, none of which petitioners contest, if we sustain the disallowance of their claim to a business *502 bad debt deduction. The issues for decision are (1) whether advances in 1984 by Richard W. Lease (petitioner) to Montex Industries Corp. (Montex) were debt or capital contributions; and (2) if the advances were debt, whether the debt was business or nonbusiness bad debt within the meaning of section 166 when petitioner's interest in Montex became worthless in 1985. We hold that the advances were contributions to capital, and that even if the advances were debt, the debt was nonbusiness bad debt. Petitioner is therefore relegated to the capital loss treatment allowed by respondent on the worthlessness of his interest in Montex represented by his advances, and to respondent's correlative disallowances of medical expense deductions and increase in 1986 self-employment income. FINDINGS OF FACT Some of the facts have been stipulated, and they are so *503 found. When petitioners filed their petition in this case, they were residents of Garland, Texas. Petitioner is a certified public accountant who was employed by several mechanical construction companies in financial officer and business management positions for almost 20 years. From 1981 to 1985, petitioner was employed by Ronald Chamness through two of his wholly owned construction corporations, C.M. Mechanical Corp. (C.M. Mechanical) and Continental Mechanical Engineering (Continental). Continental had installed the heating, air-conditioning, and plumbing equipment in most of the office buildings built in downtown Dallas during the 1970's and early 1980's. In 1984, Mr. Chamness acquired C.M. Mechanical and made petitioner its executive vice president and chief financial officer. Petitioner's responsibilities at C.M. Mechanical included business development. During late 1984, petitioner stopped working as chief financial officer of C.M. Mechanical, but retained the title of vice president until he resigned in 1985. Petitioner reported salary income of $ 46,160 from C.M. Mechanical on his 1985 Federal income tax return. Petitioner also reported Schedule C gross income of *504 $ 163,943.09 as a business consultant. During 1983 and 1984, Mr. Chamness tried to develop new business opportunities for C.M. Mechanical and Continental because of the recent downturn in the Texas construction industry. He hired a mining engineer to explore mining opportunities on behalf of these corporations. The engineer located a group of mining properties, covering between 4,000 and 5,000 acres, for lease in Montana. Petitioner, through his roles as chief financial officer and new business developer at C.M. Mechanical, acquired some familiarity with these properties. Continental and C.M. Mechanical financed the engineer's investigation of these properties, making total payments of $ 214,151.50 and $ 195,505.94, respectively, during this period. Petitioner and Mr. Chamness considered these payments to be advances in the nature of loans to a possible venture to be started in the future. In summer 1984, petitioner went to Montana and spent several days meeting the owners of the properties. Soon thereafter, petitioner toured the properties with another mine consulting firm. Following the tour, this consulting firm prepared a report that the properties contained gold in commercial *505 quantities. While petitioner was investigating the mining properties in Montana, C.M. Mechanical was preparing to acquire another mechanical construction corporation, the Sam P. Wallace Co. (SPW). The proposed acquisition agreement provided that the chief financial officer of SPW would be the financial officer of the combined corporations. When petitioner realized that he would soon be out of a job, he began to consider the possibility of promoting and managing a mining venture on the Montana properties he had visited. Petitioner planned to form a mining corporation to engage in hard rock mining for gold on the properties, and estimated that $ 3 million in capital, to be provided by investors, would be needed to finance operations for 3 years. Petitioner began to look for investors. In September 1984, he was introduced to Paul-Luc Sulitzer, a French financier. Petitioner went to New York City to discuss the consulting firm's report and a business plan with Mr. Sulitzer. The plan provided for a $ 3 million cash investment in a mining corporation to be managed by petitioner. Mr. Sulitzer orally committed to invest the entire $ 3 million after the corporation was formed and *506 contracts signed to lease the mining properties. Petitioner and Mr. Sulitzer also agreed that petitioner would receive a 10-percent equity interest in the corporation in exchange for his organizational services. Because petitioner was accustomed to the former boom-time environment in the Dallas construction industry, in which Mr. Chamness and others would start work on a multi-million-dollar project on a handshake, petitioner did not insist on a written agreement from Mr. Sulitzer. On October 3, 1984, petitioner incorporated Montex in the State of Montana to carry on the mining business. Montex's articles of incorporation authorized it to issue 50 million shares of common stock having a par value of $ 1 per share. Petitioner was the sole promoter and initial sole director of Montex. On October 10, 1984, petitioner, relying on his oral commitment from Mr. Sulitzer and the thought that Montex would not qualify for a loan from a commercial lender, borrowed $ 200,000 from a bank on a 6-month note. Petitioner immediately advanced $ 100,000 to Montex for its formation, to enable it to obtain land lease contracts, and to pay startup costs needed to satisfy what petitioner believed *507 were Mr. Sulitzer's requirements. Petitioner believed his advance would be repaid 30 to 45 days after Mr. Sulitzer made his $ 3 million investment. On November 25, 1984, petitioner met Mr. Sulitzer in Paris. Mr. Sulitzer orally reaffirmed his commitment to fund the venture and promised the $ 3 million in less than 30 days. While waiting for Mr. Sulitzer's investment, petitioner advanced another $ 70,000 to Montex, which he used to buy mining equipment on behalf of Montex. Shortly thereafter, Mr. Sulitzer backed out of his commitment. To avoid losing his prior advances to Montex, petitioner advanced another $ 125,000 to enable Montex to retain the mining property leases while he tried to find new investors. By November 1984, C.M. Mechanical had acquired SPW and petitioner was no longer chief financial officer of C.M. Mechanical. In January 1985, with his bank loan coming due on April 15, 1985, petitioner went to Montreal, Canada, to meet another prospective investor, Jean-Claude Benarroch. Mr. Benarroch orally agreed to provide $ 1 million of capital and to repay petitioner's advances to Montex. However, Mr. Benarroch made his commitment contingent on Montex being restructured *508 to his satisfaction. Petitioner and Mr. Benarroch agreed that petitioner would be president of Montex and would receive a salary of $ 100,000 per year. In addition, petitioner and Mr. Benarroch decided, because of the reduction in capital being contributed, to change the mining technique originally intended by petitioner, hard rock mining, to placer mining. Petitioner did not obtain any document evidencing his agreements with Mr. Benarroch. Between February and April 1985, Mr. Benarroch advanced $ 175,000 to Montex, and his total investment in Montex never exceeded this amount. In April and the months following, Mr. Benarroch caused Montex to be restructured, through the events described below, in aid of his efforts to bring additional investors into the corporation. On April 20, 1985, the Montex shareholders [2] entered into a voting agreement that provided for a new board of directors for Montex. The new board consisted of petitioner, Mr. Chamness, Mr. Benarroch, and his partner, Samy Abitol. The voting agreement gave Mr. Benarroch and Mr. Abitol veto power over any business decisions concerning Montex proposed by petitioner and Mr. Chamness. *509 On April 21, 1985, the board of directors appointed petitioner president at an annual salary of $ 100,000, payable weekly. Petitioners' 1985 income tax return did not report any salary income from Montex. On May 9, 1985, a Unanimous Consent in Lieu of Special Meeting of the board of directors was adopted to reflect the amounts previously advanced by petitioner, C.M. Mechanical, and Continental. It recited that Montex "had previously or intends to" issue notes in accordance with the amounts set forth below: Number of shares
Number of shares
Equity
Principal of
Funds advanced
at $ .03/share
investment
note
Petitioner
[1] $ 304,768.63
305,000
$ 9,150
$ 295,618.63
Continental
214,151.50
210,000
6,300
207,851.50
C.M. Mechanical
195,505.94
196,000
5,880
189,625.94
The Unanimous Consent document ratified a prior issuance to *510 Mr. Benarroch of 175,000 shares of common stock, valued at $ 5,250 or 3 cents per share, and a nonnegotiable, convertible promissory note in the amount of $ 169,750, in exchange for his $ 175,000 advance. The Unanimous Consent document did not describe the interest payable and due date of this note, other than to state that the principal and interest would become convertible into an undisclosed number of shares "on or before August 1, 1985". The Unanimous Consent document also ratified a prior issuance to a group of individuals of unsecured nonnegotiable promissory notes, whose principal and interest were convertible into an undisclosed number of shares of common stock, in exchange for a total of $ 218,250 that they had advanced to Montex. The Unanimous Consent document also listed the shareholders of Montex who were to receive shares of common stock in exchange for services, as set forth below: Date
Value of services
Number of shares
Jean-Claude Benarroch
Holdings Inc. 4/15/85
$ 75,000
2,500,000
R.E. Chamness
12/31/84
30,000
1,000,000
B & T Trading
International, Ltd. 4/15/85
59,100
1,970,000
Denise LaFond
4/15/85
900
30,000
R. Wayne Lease
4/15/85
18,750
625,000
Don M. Kent
4/15/85
12,000
400,000
Vivian Nusbaum
4/15/85
8,250
275,000
*511 Petitioner's 625,000 shares of stock referred to above are not at issue in this case. Petitioners' 1985 income tax return did not report any compensation income in respect of the receipt of these shares. On May 15, 1985, petitioner received Montex's unsecured, nonnegotiable, subordinated promissory note in the amount of $ 295,617.97, [3] with a stated due date of August 15, 1985. However, petitioner's right to repayment was subordinated to the payment rights of the above-mentioned group of individuals listed in the Unanimous Consent document as holding unsecured convertible promissory notes. The Subordination and payment provisions of petitioner's note from Montex contemplated repayment later than August 15, 1985. Petitioner's note was to be paid from the "net cash flow" of Montex, meaning gross cash receipts of Montex, less operating expenses, land payments, and any amount reserved by the board of directors to ensure working capital of $ 50,000. *512 On June 10, 1985, the board of directors and shareholders of Montex unanimously consented to a modification of the articles of incorporation that changed the par value of the Montex stock from $ 1 per share to no par value. On June 22, 1985, petitioner signed two separate subscription agreements, one stating that he would receive 625,000 shares of common stock in exchange for $ 18,750 worth of services he had previously provided Montex, and the other stating that he would receive 305,000 shares of common stock for $ 295,617.97 [4] the amount of his 1984 advances to the corporation. Petitioner received a certificate for 930,000 shares of Montex common stock dated June 19, 1985. *513 During 1985, Montex defaulted on its property acquisition agreements because it was not able to make the additional payments required by the property leases. In addition, Montex was unable to and did not pay petitioner's promissory note on its August 15, 1985, maturity date or at any time thereafter. On July 14, 1986, petitioner caused Montex to file a petition for relief under chapter 7 of the Bankruptcy Code. Petitioners claimed, on their 1985 income tax return, a business bad debt deduction of $ 295,618 and a capital loss of $ 27,900 attributable to the worthless stock petitioner held in Montex. Respondent disallowed the bad debt deduction on the grounds that petitioner's advances had been capital contributions rather than debt, and, in the alternative, that if the funds advanced by petitioner were found to be debt, they should be characterized as nonbusiness bad debt, deductible as short-term capital loss under section 166(d). Respondent, in the statutory notice, and the parties, in the presentation and argument of this case, have agreed that petitioner's interests in Montex became worthless during 1985. OPINION Petitioners contend that petitioner's advances to Montex *514 were loans to Montex, and as such, deductible as bad debt under section 166 for the year in which they became worthless. Petitioners argue that petitioner's advances were made with the dominant purpose of obtaining continuing employment from Montex and were proximately related to petitioner's trade or business of being an employee of Montex, so that they were business bad debt deductible from ordinary income. Initially, we must decide whether petitioner's advances to Montex were debt or capital contributions. If the advances were debt, then we must decide whether petitioners are entitled to a business bad debt deduction of the amounts advanced. Debts or Capital Contributions
Inasmuch as the Treasury has never issued final debt-equity regulations under section 385, standards in the case law continue to control this area of the tax law. In distinguishing debt from equity, courts have looked through taxpayers' labels to determine whether an advance creates a debtor-creditor relationship. In their efforts to look through form to substance, courts have identified and used numerous factors as aids. The Court of Appeals for the Fifth Circuit, to which an appeal in this case *515 would lie, barring stipulation to the contrary, in Estate of Mixon v. United States, 464 F.2d 394, 402 (5th Cir. 1972), has identified a nonexclusive list of 13 factors to be considered, and reference to them will be made in due course. Although this Court's view is that whether an advance by a shareholder to a corporation is a loan or a contribution to capital is a question of fact, Georgia-Pacific Corp. v. Commissioner, 63 T.C. 790, 795 (1975); Magee v. Commissioner, T.C. Memo. 1993-305, the Court of Appeals for the Fifth Circuit views the question as one of law. Texas Farm Bureau v. United States, 725 F.2d 307, 311-312 (5th Cir. 1984); Estate of Mixon v. United States, supra; United States v. Snyder Bros. Co., 367 F.2d 980 (5th Cir. 1966). Mindful that the permissible scope of appellate review of legal questions is broader than that over fact questions, [5] we will do our best, after applying our facts and circumstances approach, to provide a review of the Court of Appeals' factors that will *516 satisfy its requirements. *517 Our approach begins with two basic models: that a shareholder takes the residual risk and hopes to profit from the success of the enterprise, while a creditor is paid current compensation for the use of funds in the form of fixed interest and expects and is entitled to repayment of the principal amount at a stated time, regardless of the corporation's success. In Nassau Lens Co. v. Commissioner, 308 F.2d 39, 46 (2d Cir. 1962), remanding 35 T.C. 268 (1960), then Judge Thurgood Marshall opined that whatever interests a stockholder chooses to take in a corporation, whether debt or equity, should be recognized as such, "so long as that investment has substantial economic reality in terms of the objective factors which normally surround the type [of investment] chosen", and so long as it complies "with arm's-length standards". See also Dixie Dairies Corp. v. Commissioner, 74 T.C. 476, 494 (1980) (quoting Estate of Mixon v. United States, supra at 403, referring to the need to determine whether "the transaction complies with arm's-length standards and normal business practice"). The ultimate *518 question, however, is not so much whether a third party would have made the loan, which would almost invariably be an insurmountable obstacle to debt characterization if applied to a startup corporation such as Montex. The question is whether, on the basis of the facts known when the stockholder made the advance, he could reasonably expect the corporation to repay the loan in accordance with terms in line with those generally prevailing in the business community. See Nassau Lens Co. v. Commissioner, supra; Litton Business Systems, Inc. v. Commissioner, 61 T.C. 367, 377 (1973). This is not a question of what the taxpayer subjectively intended, but rather a "reasonable man" test of what the person making the advance could reasonably expect. Nor is it so much a question of whether the advances are "at the risk of the business". All unsecured loans are at the risk of the business. The proper questions are how substantial the risk is and whether a creditor might reasonably incur it. It is against this background that the various factors can serve as indicators or criteria of debt capacity that bear on the corporation's *519 ability to repay and the likelihood of repayment, as well as whether the parties complied with arm's-length standards and normal business practice. Analyzing the facts of this case against the above-stated framework of assumptions and questions, it becomes clear that petitioner's advances to Montex were capital contributions, rather than debt. When petitioner made his advances to Montex, it had no capital or assets and had not begun its operations as a mining business. Petitioner, as promoter of Montex, was relying on an oral promise for capital from an investor he had not previously dealt with. Petitioner had to realize that a creditor lending funds to a corporation under these circumstances faced a more than substantial risk of not being repaid. No reasonable creditor would have been comfortable making a loan to a corporation without any assets, capital, or contractually committed investors. Petitioner's situation is another sad case of a promoter trying to start a business that could not justify an indebtedness on any arm's-length standard because its prospects were so speculative and its tangible and intangible assets so insubstantial. Generally, the time for applying the *520 tests required to classify a transaction as debt or equity is at its inception. Jack Daniel Distillery v. United States, 100 Ct. Cl. 308, 379 F.2d 569 (1967). For the most part, this creates a one-way street. Although an advance may initially qualify as debt and then become equity at a later date, see, e.g., Tampa & G.C.R.R. v. Commissioner, 469 F.2d 263 (5th Cir. 1972), affg. 56 T.C. 1393 (1971), an advance initially treated as equity will not thereafter become debt, unless there is a later recapitalization or the equivalent. When petitioner made the advances to Montex he did not document their status as debt or equity. There is no evidence in the record that petitioner's advances were recorded in any fashion on Montex's books or accounts. Five months later, when Mr. Benarroch took control of Montex through the voting agreement, Mr. Benarroch's then-recent advances, petitioner's prior advances, and the preincorporation advances of C.M. Mechanical and Continental were all purportedly documented as debt. This sequence of events suggests that we should apply the factor analysis *521 both before and after the documentation. As mentioned above, the Court of Appeals for the Fifth Circuit has indicated that the following factors may be relevant in determining whether an advance is debt or a capital contribution: (1) The names given to the documents evidencing the indebtedness; (2) the presence or the absence of a fixed maturity date; (3) whether the source of repayments is fixed or contingent on the success of the business; (4) the right to enforce payment of principal and interest; (5) whether there is increased participation in management as a result of the advance; (6) whether repayment of the advance is subordinated to the claims of regular corporate creditors; (7) the intent of the parties; (8) whether the corporate debtor is "thinly" or inadequately capitalized; (9) whether advances were made in proportion to the shareholder's stock ownership in the corporation; (10) whether there is a provision for the payment of interest; (11) the ability of the corporation to obtain loans from outside lending institutions; (12) the extent to which the advance was used to acquire capital assets; and (13) the failure of the debtor to repay on the due date or to seek a postponement. *522 Estate of Mixon v. United States, 464 F.2d at 402. "Each factor is not equally significant, nor is any one factor determinative. Moreover, each unique fact situation dictates the relevancy of various factors." Baldwin v. Commissioner, T.C. Memo. 1993-433 (citations omitted). Before documentation
Although courts generally insist that shareholder advances be labeled as indebtedness and have a fixed maturity date to be recognized as debt for tax purposes, absence of a certificate or other formal evidence of indebtedness is not dispositive if the transaction otherwise complies with arm's-length and normal business standards. Estate of Mixon v. United States, supra at 403; Rowan v. United States, 219 F.2d 51 (5th Cir. 1955). This is consistent with the basic requirement that stockholder loans comply with general arm's-length standards. During late 1984, when petitioner was making his advances to Montex, no promissory note or notes were contemporaneously issued. In addition, petitioner has not presented any evidence that Montex ever recognized in its *523 corporate books or records the amounts that petitioner had advanced. Thus, there was no evidence in the corporate records of the advances being debts, or even being made, and there were no provisions for the payment of interest, no maturity date, and no stated right to enforce repayment. Montex was undercapitalized from its inception. When petitioner made his advances in 1984, Montex needed $ 3 million to operate as a mining business, but had no capital. Although C.M. Mechanical and Continental, during 1983 and 1984, had advanced $ 400,000 to the venture that eventually became Montex, those funds had already been fully expended on investigation of the mining properties when petitioner made his advances. When petitioner made the $ 100,000 advance and the later $ 70,000 advance, Montex had no other capital or assets, but was depending on Mr. Sulitzer's oral commitment to contribute $ 3 million in capital. It is clear that Montex, with such limited resources, was inadequately capitalized. Although a negative answer to whether a commercial lender would have lent Montex the funds when petitioner did is insufficient, standing alone, to treat purported debt as equity, it does bear *524 on whether petitioner's expectations of repayment were reasonable. Estate of Mixon v. United States, 464 F.2d at 410. Inasmuch as Montex had no other capital or assets at the time petitioner made the advances, it would in all likelihood have been impossible for Montex to qualify for a loan from a commercial lender. In addition, Montex was going to engage in the risky business of gold mining, which it had not yet started. It is doubtful that a reasonable creditor would have lent Montex the funds it needed, solely on the basis of an oral commitment from a foreign investor. Under these circumstances, it was unreasonable for petitioner to expect repayment from Montex. Montex's use of the funds advanced by petitioner also points toward the advances being equity. Although Montex did not use the funds petitioner advanced solely to purchase capital assets, it used the funds to incorporate, obtain land lease contracts, and pay rent on the properties it had leased. The Court of Appeals for the Fifth Circuit has stated that use of shareholder advances to finance the necessary first assets and startup costs of a corporation is a strong indicator of a contribution *525 to capital. [6]Slappey Drive Indus. Park v. United States, 561 F.2d 572 (5th Cir. 1977); Plantation Patterns, Inc. v. Commissioner, 462 F.2d 712 (5th Cir. 1972), affg. T.C. Memo. 1970-102. Petitioners urge us to consider petitioner's subjective intent in our debt-equity determination. Petitioners contend that when petitioner obtained the bank loan he intended only to make a short-term advance to Montex in anticipation of Mr. Sulitzer's fulfillment of his $ 3 million commitment. They argue that petitioner's intent is evidenced by the 6-month note he gave to the bank, stressing that it is a type of note not generally associated with a long-term business investment. We reject this argument. Characterization of purported debt for tax purposes must be determined from objective intent, or more accurately, the taxpayer's intent as ascertained by looking *526 behind the form of the transaction to all the relevant objective facts and circumstances. Because the subjective intent of the parties does not control the tax consequences of their actions, United States v. Hertwig, 398 F.2d 452, 455 (5th Cir. 1968), a taxpayer's declaration that he expected prompt repayment is no substitute for evidence of the reasonableness of his expectation that is ascertainable from the circumstances of the transaction. [7] In this inquiry, "What the parties do is more important than what they say". Wilbur Security Co. v. Commissioner, 279 F.2d 657, 662 (9th Cir. 1960), affg. 31 T.C. 938 (1959). *527 The Court of Appeals for the Fifth Circuit has stated that when objective factors do not clearly demonstrate the intent of the parties, it may be helpful to consider subjective intent. Tyler v. Tomlinson, 414 F.2d 844 (5th Cir. 1969). In Texas Farm Bureau v. United States, 725 F.2d 307, 312 (5th Cir. 1984), the Court of Appeals for the Fifth Circuit held that a taxpayer's subjective intent warrants examination only when the court's analysis of the more reliable objective factors fails to provide a clear answer to whether a shareholder advance is debt or equity. Our examination of the objective factors has led us to conclude that petitioner's advances were contributions to capital and, therefore, to disregard petitioner's statements about his intentions, which reflected his hopes rather than his reasonable expectations. Short-term advances to an operating corporation, in response to an immediate or seasonal need for cash, made as part of a continuing series and ordinarily repaid in full, have been upheld as valid debts. See Estate of Mixon v. United States, 464 F.2d 394 (5th Cir. 1972); *528 Rowan v. United States, 219 F.2d 51 (5th Cir. 1955); Gilboy v. Commissioner, T.C. Memo. 1978-114. Short-term advances made under these conditions are likely to be repaid in the ordinary course of business because they are made to a business that has a history of operations on which a reasonable expectation of repayment can be based. Petitioner's advances are clearly distinguishable from such short-term advances. Petitioner's advances were made when and soon after Montex was formed and were indispensable to its startup. Petitioner could not realistically expect Montex to repay the advances in the near future because it had not yet received sufficient capital to enable it to begin operations. Under these circumstances, it was unreasonable for petitioner to believe he would be repaid before his own bank loan became due. At trial, petitioner referred to the customs and practices in the construction business in Texas. Mr. Chamness and building contractors would often begin projects on little more than a handshake with owners with whom they had a course of dealing and would not document their deals until later. This may *529 be so, and starting work on a project in these circumstances would probably provide a basis for a claim of quantum merit if an owner should back out of a project after the contractor had started working on it. But these customs and practices shed no light on whether a shareholder's advances to his wholly owned startup corporation such as Montex should be characterized as capital contributions or debt. Although petitioner may have been accustomed to doing business on the basis of a handshake in his prior business milieu, good business sense and petitioner's extensive business experience should have prompted him to insist on formal agreements, first with Mr. Sulitzer and then with Mr. Benarroch if he expected that his advances would be treated as debt for tax purposes. Although individuals who have an established business relationship may often do their deals on a handshake, it is risky business for those who have had no prior business dealings and have just met. In making his advances, petitioner decided to "let his money ride with the ups and downs of the venture, hoping * * * some day [to] reap the fruits of a successful investment", Hudson v. Commissioner, 31 T.C. 574, 583 (1958), *530 but the funds needed to get Montex into business were never forthcoming. Someone who "bets on the come" in this fashion is acting more like a speculative equity investor than a lender who has a reasonable expectation of repayment. After documentation
On May 9, 1985, the Unanimous Consent document was adopted, purportedly reflecting the interests that certain investors, including petitioner, held in Montex. The issuance of the $ 295,617.97 promissory note to petitioner on May 15, 1985, pursuant to the Unanimous Consent document, does not persuade us that petitioner's previous advances were debt, or that they thereby became debt. The circumstances in which this note was issued and the fact that Montex failed to pay it confirm the substance of the prior advances as capital contributions. The promissory note was issued approximately 5 months after petitioner advanced the funds. It was issued in response to the concerns and desires of Mr. Benarroch in restructuring Montex to attract new investors to the corporation. We are not persuaded that the note evidenced an indebtedness between petitioner and Montex for tax purposes. Courts have noted that an indicator of debt is a fixed *531 obligation to repay principal and have stressed the importance of repayment not being contingent on the success of the business. [8] See Stinnett's Pontiac Service, Inc. v. Commissioner, 730 F.2d 634, 639 (11th Cir. 1984), affg. T.C. Memo. 1982-314; Estate of Mixon v. United States, 464 F.2d at 405. When Montex issued its promissory note to petitioner, it had not yet commenced operations and had no cash-flow history. Although petitioner's promissory note from Montex had a stated maturity date of August 15, 1985, its subordination and payment provisions contemplated repayment later than August 15, 1985. In addition, the Unanimous Consent document stated that the note issued to petitioner was payable only out of "net cash flow", an amount defined as: the gross cash receipts of Montex for such period, which amount shall be determined by the good faith judgement of the board of directors of Montex, minus (i) operating expenses for such period (ii) land payments for such period and (iii) any amount reserved by the board of directors of Montex for working capital to insure that Montex maintains *532 working capital of $ 50,000. * * *
This indicates that repayment was expected only when Montex was earning money from its mining operations. If Montex never had net cash flow, it had no obligation to make payment on the note. Moreover, it was not reasonable to believe that Montex would have earnings from its mining operations by the stated maturity date of the note, which was 3 months away, when Montex was not adequately capitalized at the time and had not begun mining. Although petitioner had previously advanced Montex more than $ 295,000, that amount had been fully spent 5 months before the note was issued. The only capitalMontex had at this time was the $ 175,000 more recently advanced by Mr. Benarroch. Such limited capital clearly demonstrates that Montex was undercapitalized and unable to carry on an operation requiring at least $ 1 million. *533 Subordination of debt bears on the reasonableness of the taxpayer's expectation of payment. If subordination exists it must be examined in light of the surrounding circumstances. Although subordination of debt to the claims of general creditors is indicative of equity, subordination per se is not necessarily fatal to establishing debt for tax purposes. Estate of Mixon v. United States, 464 F.2d 394 (5th Cir. 1972). Inasmuch as petitioner's promissory note from Montex was expressly subordinated to the claims of other general corporate creditors, this factor, in the absence of any countervailing factors indicating the likelihood of repayment in the face of subordination, clearly points to capital contribution treatment. A lender is concerned with earning interest as compensation for the borrower's use of his money. The failure to provide for interest evidences a primary concern for enhancing the earnings of the corporation and increasing the market value of its stock, which is the attitude of a shareholder. Curry v. United States, 396 F.2d 630 (5th Cir. 1968). If no interest runs on an advance from a shareholder *534 to a corporation, the transaction appears to be identical, except in name, to a contribution of capital. National Carbide Corp. v. Commissioner, 336 U.S. 422, 435 (1949). Accordingly, the failure to provide for interest is evidence that a purported debt is, in reality, a contribution to capital. Petitioner showed no concern about receiving interest on the advances. The promissory note had no provisions for interest payments and no interest was in fact paid on the advances. When the promissory note was issued in May 1985, it totaled the approximate amount advanced by petitioner to Montex in late 1984, indicating that no interest had previously been paid or provided for. Approximately 1 month after Montex issued petitioner the promissory note, it also issued petitioner 305,000 shares of stock under the subscription agreement, purportedly for the same $ 295,617.97 petitioner had advanced in 1984. The promissory note was not canceled upon the issuance of the stock. At trial petitioner was unable to explain why or whether he held both stock and debt for the advances he had made to Montex, or whether the later issued stock had been substituted for the *535 promissory note. On reflection, we have concluded that the statement of the consideration in this subscription agreement was mistaken, and that petitioner had paid a separate consideration of $ 9,150 for the 305,000 shares of Montex stock. However, this conclusion affords no comfort to petitioner concerning the tax treatment of his belatedly issued promissory note. Overall, both Montex's and petitioner's behavior leads us to believe he never reasonably expected the advances to be repaid. The substance and the form of petitioner's transactions with Montex compel the conclusion that petitioner's advances were contributions to capital and not genuine debt. Bad Debt Deduction
For the sake of completeness, we summarily address the question of business versus nonbusiness bad debt. We conclude that there was no proximate relationship between petitioner's advances and his business activities as an actual or prospective employee. This conclusion reinforces our prior factual and legal conclusions that the advances were capital contributions rather than debt. See United States v. Henderson, 375 F.2d 36 (5th Cir. 1967), revg. and remanding 64-2 USTC par. 9691, 19 AFTR 2d 67-486 (E.D. Tex. 1964), *536 where, after holding that a series of advances were capital contributions, the Court of Appeals for the Fifth Circuit went on to consider their business versus nonbusiness character on the alternative assumption that they were debt. Section 166(a) permits a deduction from ordinary income for any business bad debt that becomes worthless during the taxable year. See Burwell v. Commissioner, T.C. Memo. 1988-495. In contrast, a worthless nonbusiness bad debt is treated as a short-term capital loss under section 166(d)(1). Nonbusiness bad debt is defined in section 166(d)(2) as debt other than (1) debt created or acquired in connection with a trade or business of the taxpayer; or (2) debt the loss from the worthlessness of which is incurred in the taxpayer's trade or business. In order for the advances petitioner made to Montex to qualify as business bad debt and be deductible against ordinary income, petitioner must establish he acquired the debt in the course of his trade or business and that the debt was proximately related to it. Sec. 1.166-5(b), Income Tax Regs.
It is well established that, for purposes of section 166, a taxpayer can be in the *537 trade or business of being an employee. Trent v. Commissioner, 291 F.2d 669 (2d Cir. 1961), revg. 34 T.C. 910 (1960); Putoma Corp. v. Commissioner, 66 T.C. 652 (1976), affd. 601 F.2d 734 (5th Cir. 1979); Gould v. Commissioner, 64 T.C. 132 (1975). However, when the creditor of a corporation is a stockholder/investor and also an employee, the debt must be proximately related to his employment interest rather than to his investment as a stockholder to receive business bad debt treatment. In United States v. Generes, 405 U.S. 93, 103 (1972), the Supreme Court established the test for determining whether a particular debt is proximately related to the taxpayer's trade or business. The Court stated that in determining whether a bad debt has a "proximate" relation to the taxpayer's trade or business, as the Regulations specify, and thus qualifies as a business bad debt, the proper measure is that of dominant motivation, and that only significant motivation is not sufficient. * * *
The determination *538 of the taxpayer's dominant motivation is a question of fact to be made after reviewing the entire record and is a question on which the taxpayer bears the burden of proof. Estate of Mann v. United States, 731 F.2d 267 (5th Cir. 1984); see also Putoma Corp. v. Commissioner, supra at 674. Dominant motivation is determined at the time the taxpayer makes the loan to his employer. Harsha v. United States, 590 F.2d 884 (10th Cir. 1979). Petitioner contends that his dominant motivation in making the advances was to secure employment with Montex because he was losing his position as chief financial officer at C.M. Mechanical. Although petitioner may have had a desire, or even significant motivation, to work for Montex, we are not persuaded that petitioner's dominant motive in making the advances was to promote or protect an employment interest with Montex. When petitioner made the advances, Montex was not paying him a salary. While a taxpayer need not receive a salary in order for advances to be related to his trade or business, Burwell v. Commissioner, supra, *539 "a loan motivated by one's status as an employee seems more plausible where its objective is to protect a present salary, rather than promote a future one", Putoma Corp. v. Commissioner, supra at 674. Moreover, it is questionable whether petitioner ever received a salary from Montex; petitioners, on their 1985 Federal income tax return, reported only the salary petitioner earned at C.M. Mechanical and nothing from Montex. A comparison of the taxpayer's advances to the corporation to his annual salary from the corporation may be helpful in determining his dominant motivation. United States v. Generes, supra at 106-107; Putoma Corp. v. Commissioner, supra at 674. Large advances relative to a small salary indicate the taxpayer is more interested in making and protecting an investment than with promoting or protecting a salary. The minutes of the Montex April 28, 1985, board meeting authorized a salary for petitioner at an annual rate of $ 100,000. Some months previously, petitioner had advanced more than $ 295,000 to Montex. Even if petitioner did eventually receive some small *540 amount of this salary from Montex, it "strains one's credulity", Rosenbaum v. Commissioner, T.C. Memo. 1973-76, to believe that petitioner had made these prior advances with the dominant motivation of assuring a before tax annual salary of $ 100,000 that he agreed to with a subsequent investor. Cf. Stern v. Commissioner, T.C. Memo. 1976-245; Mann v. Commissioner, T.C. Memo. 1975-74; Haslam v. Commissioner, T.C. Memo. 1974-97. Petitioner's dominant motive in making the advances to Montex was to get the business off the ground and to hold and attract prospective investors, and then to protect the money he had already invested in the venture. Petitioner testified at trial that he made the first advances to incorporate and get Montex into the position Mr. Sulitzer desired and the last advance to keep Montex afloat so it would be able to attract new investors after the arrangement with Mr. Sulitzer failed to materialize. Petitioner believed that if he established Montex as a successful corporation, it would eventually provide him with full-time gainful employment *541 as an incidental benefit. Petitioner's behavior was more typical of an investor who desires to establish a business and is willing to advance the startup funds than of someone who becomes a creditor in order to protect his salary interest as an employee. See Shinefeld v. Commissioner, 65 T.C. 1092, 1099 (1976). If one motive of petitioner is to be identified as "dominant", it was his entrepreneurial motive to establish Montex and make it a profitable mining business. Id.
Even if petitioners should ultimately prevail on appeal on their argument that the advances to Montex were debt, rather than contributions to capital, the facts and circumstances clearly indicate that the worthlessness of such debt would not result in business bad debt within the meaning of section 166. CONCLUSION The record in this case compels the conclusion that petitioner's advances to Montex were equity rather than debt. Petitioner made the advances not as a creditor who has a reasonable expectation of repayment but as an investor who assumes the risks and stands to profit from the success of the business. We therefore sustain respondent's determination that the advances *542 made by petitioner to Montex were capital contributions; as such they did not become deductible as business bad debts when they became worthless. Decision will be entered for respondent. Footnotes
1. All section references are to the Internal Revenue Code in effect for the years in issue. All Rule references are to the Tax Court Rules of Practice and Procedure.↩
2. The shareholders of Montex at this time were petitioner, B&T Trading International, Ltd., Vivian Nusbaum, Jean-Claude Benarroch, Jean-Claude Benarroch Holdings, Inc., Ronald Chamness, Denise LaFond, Continental, and C.M. Mechanical. The record does not show the number of shares held by them att his time.↩
1. At this time the advances petitioner had made to Montex amounted to $ 295,618.63. The source of the additional $ 9,150 was expenses that petitioner had paid on behalf of Montex in spring 1985. Petitioner agreed to take stock rather than cash as repayment of these advances,as required by Mr. Benarroch.↩
3. The face amount of this note was 66 cents less than the face amount of petitioner's note as described in the Unanimous Consent document.↩
4. The chart, supra↩ p. 8, extracted from the Unanimous Consent document, indicates that petitioner was to receive the 305,000 shares in exchange for payments of $ 9,150 on behalf of Montex, in addition to the $ 295,618 of advances. We find that the statement in the subscription agreement of the consideration paid for the 305,000 shares was a scrivener's error.
5. Under the Federal Rules of Civil Procedure "Findings of fact * * * shall not be set aside unless clearly erroneous". Fed. R. Civ. P. 52(a). This standard requires that there be a "definite and firm conviction that a mistake has been committed" to warrant reversal. United States v. United States Gypsum Co., 333 U.S. 364, 395 (1948). Conversely, questions of law are given an independent review, Pullman-Standard v. Swint, 456 U.S. 273 (1982), thus allowing greater latitude to the appellate court in reviewing the trial court's determination. The majority of Courts of Appeals take the view that the question is one of fact, and that the decision is not to be set aside unless clearly erroneous. Brake & Electric Sales Corp. v. United States, 287 F.2d 426 (1st Cir. 1961); Gilbert v. Commissioner, 262 F.2d 512 (2d Cir. 1959), affg. T.C. Memo. 1958-8; Piedmont Minerals Co. v. United States, 429 F.2d 560 (4th Cir. 1970); Gooding Amusement Co. v. Commissioner, 236 F.2d 159 (6th Cir. 1956); Charter Wire, Inc. v. United States, 309 F.2d 878 (7th Cir. 1962); A.R. Lantz Co. v. United States, 424 F.2d 1330 (9th Cir. 1970); McSorley's, Inc. v. United States, 323 F.2d 900 (10th Cir. 1963). The Court of Appeals for the Fifth Circuit takes the minority view and treats the question as one of law, subject to review de novo. Texas Farm Bureau v. United States, 725 F.2d 307 (5th Cir. 1984). In each case in which the Court of Appeals for the Fifth Circuit has emphasized this view, it provided the rationale for plenary review of a District Court decision in which a jury had determined that shareholders' purported debt was debt rather than equity. See, e.g., Texas Farm Bureau v. United States, supra; United States v. Snyder Bros. Co., 367 F.2d 980 (5th Cir. 1966). To the same effect, see Scriptomatic, Inc. v. United States, 555 F.2d 364↩ (3d Cir. 1977).
6. But cf. Hickman, "Incorporation and Capitalization", 40 Taxes 974↩, 993 (1962).
7. In Tyler v. Tomlinson, 414 F.2d 844, 850 (5th Cir. 1969), the Court of Appeals for the Fifth Circuit stated: Tax law requires that creditorship have genuine existentiality. This requires more than a declaration of intention to create an indebtedness and more than the existence of corporate paper encrusted with the appropriate nomenclature captions * * * * * * We therefore look not to mere labels or to the self-serving declarations of the parties, but to the more reliable criteria of the circumstances surrounding the transaction * * * [Citations omitted.]↩
8. But cf. Federal Express Corp. v. United States, 645 F. Supp. 1281↩ (W.D. Tenn. 1986), for the view that payment of a debt from net earnings only affects the timing of repayment and does not create a contingency in the obligation to repay when the corporate debtor has been generating positive cash flow and its ability to continue doing so is expected to be maintained.