T.C. Memo. 2017-1

UNITED STATES TAX COURT

JOHN M. SENSENIG AND ALTA Z. SENSENIG, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 16254-11.                                     Filed January 3, 2017.

P-H was the sole shareholder and president of CLCL, an
S corporation. CLCL provided high-risk capital to various
companies, including G-L, LFP, and WSC. P-H also owned an equity
interest in each of G-L, LFP, and WSC. No loan documents were
created for the advances to the three corporations; P-H did not
undertake "due diligence" analysis of borrowers that a typical creditor
would have undertaken; CLCL made the advances notwithstanding
WSC's other superior creditors; and P-H never attempted to collect
repayment of the advances. P-H claimed a bad debt deduction for
CLCL on CLCL's Form 1120S, "U.S. Income Tax Return for an S
Corporation", for 2005. The Form 1120S did not identify the source
of the deduction; but during R's examination, P-H stated it was for
alleged loans to G-L and LFP. In this litigation Ps alleged that the
bad debts arose from loans to WSC rather than to G-L and LFP.

Held: The advances by P-H through CLCL were not loans but
investments in equity, and they did not become worthless in 2005.
Therefore Ps are not entitled to a business bad debt deduction for
2005.

**[*2]**     Held, further, Ps are liable for an accuracy-related penalty under I.R.C. sec. 6662(a).

John M. Sensenig and Alta Z. Sensenig, for themselves.

Kristina L. Rico, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

GUSTAFSON, Judge:  Pursuant to section 6212(a),[1] the Internal Revenue Service ("IRS") determined deficiencies in the 2003, 2004, and 2005 income tax of petitioners, John M. Sensenig and Alta Z. Sensenig, as well as accuracy-related penalties under section 6662(a) for all three years and an addition to tax under section 6651(a)(1) for 2003.  The Sensenigs filed a timely petition under section 6213(a) which stated that they "appeal the IRS findings".  We construe this pro se petition to request, for all three years, redetermination of the tax, penalties, and (for 2003) the addition to tax.  At the time they filed the petition, they resided in Pennsylvania.

---

[1]Unless otherwise indicated, all section references are to the Internal Revenue Code (26 U.S.C.), as amended, and all Rule references are to the Tax Court Rules of Practice and Procedure.  All amounts are rounded to the nearest dollar.

[*3]  After concessions by the parties,[2] the issues to be decided are:  (1) whether the Sensenigs are entitled to a business bad debt deduction of $10,695,581 for 2005 (we hold that they are not); and (2) whether the Sensenigs are liable for the accuracy-related penalty for 2005 (we hold that they are).

### FINDINGS OF FACT

I.    Mr. and Mrs. Sensenig

Mr. Sensenig is an entrepreneur and a self-taught licensed public accountant, and Mrs. Sensenig is a homemaker.  Mr. Sensenig has prepared tax returns since 1972, received his license in December 1978, and maintained his license into the 1990s.  Mr. Sensenig owns his own tax return preparation business, Group Support, Inc., an S corporation.  At one time Mr. Sensenig prepared approximately 300 personal and business Federal tax returns a year,

---

[2]In September 2014 the parties filed a "Stipulation of Settled Issues" that addresses certain adjustments in the notice of deficiency and concludes (in paragraph 10):  "The remaining items at issue in this case are whether petitioner is entitled to the claimed Schedule E bad debt in the amount of $10,695,581 claimed in taxable year 2005 and whether the addition to tax under I.R.C. § 6662 apply."  Paragraph 5 of the "First Stipulation of Facts" filed at trial in June 2015 states that "[t]he parties entered into a stipulation of settled issues that resolved all of the issues for the taxable years 2003 and 2004."  In view of respondent's burden of production under section 7491(c), and in view of the silence of both respondent's pretrial memorandum and his post-trial brief on the penalty issue for 2003 and 2004 and the addition to tax under section 6651(a)(1), we construe the stipulation to resolve in the Sensenigs' favor the penalties for 2003 and 2004 and the addition to tax for 2003.

**[\*4]** including all of his own Federal income tax returns as well as all the Federal tax returns for the companies in which he had an equity interest.

## II. Conestoga Log Cabin Leasing, Inc.

Over the last 30 years, Mr. Sensenig has had an equity interest in a number of companies, including S corporations named Conestoga Log Cabins and Conestoga Log Cabins Leasing, Inc. ("CLCL"). Mr. Sensenig served as president of CLCL; and by 2005 he was its sole owner and the sole signatory of its bank accounts. Conestoga Log Cabins was in the business of selling log cabin kits and log home kits. CLCL was first organized as a manufacturer of the log cabin kits sold by Conestoga Log Cabins, but CLCL later provided financing to buyers who could not afford to pay for the kits outright. The funds used to finance these purchases came from Mr. Sensenig's investor pool.

## III. Investor pool

Mr. Sensenig solicited investments in the CLCL financing activity by other Mennonite and Amish individuals. The investors were promised attractive rates of return by demand notes payable by Mr. Sensenig individually or by CLCL. The notes bore interest rates but no maturity dates. Initially these invested funds were used only to finance log cabin purchases; but because numerous Amish and Mennonite investors became interested in investing funds with Mr. Sensenig, he

**[*5]** began accepting additional funds (and executing demand notes with favorable interest rates) to invest in other companies.

Mr. Sensenig, through CLCL, advanced money to start-up companies and to companies already in existence that had an opportunity for a new product or line of business. Mr. Sensenig never reviewed formal written projections for the companies that CLCL invested in. Mr. Sensenig did not obtain any third-party audits or request any financial statements, and CLCL did not finance any company if that company had other means to borrow, such as traditional banking. Mr. Sensenig stated that he relied on "gut feel" as to when something made financial sense and preferred being able to "turn on a dime"; and he acknowledged at trial that CLCL provided "high-risk capital" and that it was "an investment business".

In return for the money CLCL advanced, Mr. Sensenig acquired an equity interest in the company (apparently a minority interest in most or all cases); and Mr. Sensenig acquired financial control over each of the companies that CLCL invested in by becoming a director, a bank account signatory, and the chief financial officer. Thereafter he prepared the tax returns for the company.

Repayment of amounts advanced by CLCL to a company was not anticipated until the project had been "completed", unless there was a surplus

[*6] (which CLCL never had). CLCL and Mr. Sensenig never charged a commission or fee for services to any of the invested-in companies.

Mr. Sensenig eventually raised investments totaling in excess of $50 million from numerous investors, primarily through a small advertisement in a Pennsylvania Dutch newspaper.

Mr. Sensenig maintained detailed account records for each investor, sent the investors quarterly statements reporting interest accrued, and issued to them Forms 1099. The investors did not have a say in where Mr. Sensenig or CLCL invested their money, and there was no formal approval or voting process as to what companies or projects Mr. Sensenig or CLCL chose for investment.

IV.   2005 Investments

In 2005 Mr. Sensenig, through CLCL, invested in 15-20 different companies. Three of these are relevant to the parties' dispute about the Sensenigs' claim of a 2005 bad debt loss:

A.   Glue-Lam, Inc.

Glue-Lam, Inc. ("G-L"), was organized in 1999 as a C corporation to design and manufacture glue-laminated timber. As late as 2005, G-L's lamination process was still under development, and the product was never manufactured. Mr. Sensenig had an equity interest in G-L, and during taxable years 2003 through

[*7] 2005, CLCL advanced approximately $1,481,000 to G-L. The other shareholders of G-L contributed one dollar each to G-L's capital.

Mr. Sensenig was appointed a director, the chief financial officer, the bookkeeper, and the paymaster of G-L, and he was made a signatory of G-L's accounts. Mr. Sensenig never received a salary. Mr. Sensenig stipulated that his goal for his investment in G-L was to profit from his ownership interest.

Although the records of CLCL included journal entries labeling some of CLCL's advances to G-L as "loans", neither Mr. Sensenig nor CLCL executed any notes, agreements, or other documents with G-L evidencing any loan. According to its tax returns, G-L continued to acquire assets through 2005.

Mr. Sensenig has not provided any evidence that CLCL ever held G-L in default, and Mr. Sensenig admits he never demanded repayment of these advances from G-L. Mr. Sensenig did not take legal action against G-L because of his status as a shareholder as well as his Mennonite religious views. There is no documentary evidence that CLCL wrote off any portion of the G-L debts on its books in 2005. Mr. Sensenig stated that the only evidence would be on the tax returns themselves.

G-L was still operating after 2005 (the year of the claimed bad debt loss), and for several years CLCL continued to advance money to G-L. The records

[*8] reflect that in 2006 CLCL advanced $800,000, that in 2007 CLCL advanced another $950,000, and that in 2008 CLCL advanced an additional $1 million. Some portion (which we cannot quantify) of the funds advanced in those years reflects an increase in amounts of interest that G-L owed to CLCL, which CLCL accrued but which G-L did not pay.

As late as June 2010, G-L had an active Web site.  G-L's final Federal income tax return was filed for taxable year 2011.  As late as May 2015, G-L was listed as "Active" on the Pennsylvania Department of State Web site.

B.     Lebanon Finished Products

Lebanon Finished Products ("LFP") was organized in 2001 as an S corporation and was in the business of polishing rebar.  CLCL purchased equity in LFP because Mr. Sensenig thought one of its employees had a good idea for constructing a machine to "electro polish."  Since LFP did not have sufficient capital to develop the product, Mr. Sensenig purchased a 33% equity interest in LFP.  During taxable years 2003 through 2005, CLCL advanced $1,476,000 to LFP.

No further equity contributions were made by anyone else.  Mr. Sensenig was appointed a director, the chief financial officer, the bookkeeper, and the paymaster of LFP, and he was made a signatory of LFP's accounts.  Mr. Sensenig

[*9] did not receive a salary from LFP, and his stated goal for CLCL's investment in LFP was to profit from its ownership interest.

Neither Mr. Sensenig nor CLCL executed with LFP any documentation evidencing any loan. As with G-L, Mr. Sensenig did create, on CLCL's records, journal entries that labeled some of the advances from CLCL to LFP as "loans".

According to its tax returns, LFP continued to acquire assets through 2005.

Mr. Sensenig has not provided any evidence that CLCL held LFP in default, and Mr. Sensenig never demanded repayment of these advances from LFP. Mr. Sensenig did not take legal action against LFP because of his status as shareholder of LFP, as well as his religious views. There is no documentary evidence that CLCL wrote off any portion of the LFP debts in 2005 on its books. After 2005 LFP was still operating.

The record reflects that in 2006 (the year after the claimed bad debt loss) CLCL advanced approximately $1.2 million to LFP, of which approximately $700,000 represented accrued but unpaid interest. During 2007 CLCL continued to finance LFP because Mr. Sensenig hoped that LFP could obtain a patent. As late as May 2007 LFP had an active Web site, and as late as May 2015 LFP was listed as "active" on the Pennsylvania Department of State Web site.

[*10] C.     Washington Street Castings

Washington Street Castings ("WSC") was organized in 2001 as an S corporation and operated a foundry on a large plot of land that Mr. Sensenig considered ideal for development. WSC had financed its land acquisition by obtaining loans from unrelated third-party sources, and Mr. Sensenig acknowledged that these lenders had a claim to that property superior to CLCL's claim. At some point after WSC's land acquisition, Mr. Sensenig through CLCL bought a 25% equity interest in WSC. WSC continued operating the existing foundry.

In December 2003 the shareholders of WSC entered into an "Authorizing Resolution", by which the president of WSC was authorized to borrow money or obtain extensions of credit from CLCL. According to the resolution, the president of WSC was authorized "to execute all documents, instruments and agreements as may be required by the Lender [CLCL] to fulfill the conditions of any loan agreement, note, mortgage or other financing document", but no such documents were ever executed.

During taxable years 2003 through 2005, CLCL advanced $2,031,500 to WSC. Mr. Sensenig was appointed a director, the chief financial officer, the bookkeeper, and the paymaster of WSC, and he was made a signatory of the

[*11] company's accounts. Mr. Sensenig did not receive a salary from WSC. Mr. Sensenig's stated goal for his investment in WSC was to profit from his ownership interest.

As with G-L and LFP, Mr. Sensenig did create on the records of CLCL journal entries that labeled some of the advances from CLCL to WSC as "loans". CLCL did not hold WSC in default, and Mr. Sensenig has never made formal demands for repayment from WSC. Mr. Sensenig asserts that because he was an insider wearing several hats, no formal demands were necessary. Mr. Sensenig did not take legal action against WSC because of his status as a shareholder of both companies as well as his religious beliefs.

There is no documentary evidence that CLCL wrote off any portion of the WSC debts on its books in 2005. After 2005 WSC was still in operation. In 2006 CLCL advanced an additional $1.4 million to WSC, of which approximately $44,000 represented accrued but unpaid interest; and again in 2007 CLCL advanced approximately $1.1 million to WSC. As late as May 2015, WSC was listed as "Active" on the Pennsylvania Department of State Web site.

V.     Investigation by securities regulators

The Pennsylvania Securities Commission ("PSC") investigated Mr. Sensenig's receipt of funds borrowed from his investors. The PSC determined

**[\*12]** that Mr. Sensenig's practice of issuing demand notes to investors in return for receipt of borrowed funds constituted the sale of unregistered securities. In June 2005 Mr. Sensenig and CLCL received from the PSC an order to cease and desist the offering and sale of unregistered securities. As a result, Mr. Sensenig was barred from accepting any more money into the investor pool, and he lacked funds to advance to the not-yet-completed projects from which he had expected eventually to pay off the demand notes. He perceived this as a dire threat to CLCL, its investors, and its investments.

In January 2006 the PSC accepted Mr. Sensenig's offer of settlement and rescinded the summary order to cease and desist. Mr. Sensenig and CLCL were permanently barred from offering or selling securities in Pennsylvania unless he received a valid registration statement. Thereafter, Mr. Sensenig took steps to try to register with the U.S. Securities and Exchange Commission, but it proved too costly and he abandoned the effort.

VI.    The 2005 tax returns

In 2006 Carl Smith, a certified public accountant ("C.P.A.") employed by Group Support, Inc., prepared CLCL's 2005 Form 1120S, "U.S. Income Tax Return for an S Corporation". While doing so, he recommended that CLCL deduct $10,695,581 as bad debt. The Form 1120S does not identify the source of

[*13] the bad debt deduction; but according to CLCL's general ledger for January 1 through December 31, 2005, the total bad debt as of December 31, 2005, was $10,695,581, which included $4,917,529 attributable to G-L and $5,150,533 attributable to LFP. Mr. Sensenig followed this recommendation because he and Mr. Smith believed the possibility either company would become profitable was remote. Mr. Sensenig signed the 2005 CLCL Form 1120S that Mr. Smith prepared. Apart from the bad debt deduction, CLCL would have reported ordinary business income for 2005 in the amount of $2,741,526; but instead CLCL's Form 1120S reported a net loss, after the bad debt deduction, of $7,954,055.

Mr. and Mrs. Sensenig filed their 2005 Form 1040, "U.S. Individual Income Tax Return", on October 16, 2006. For reasons the record does not show, they did not claim on their return any portion of CLCL's reported loss.

VII.  The Commissioner's examination

The IRS examined CLCL's and the Sensenigs' tax returns for 2003 through 2005. On May 8, 2007, the Commissioner's revenue agent toured G-L and LFP; both companies were still in existence at that time, but only LFP was still operating at the time of the facility tour. On May 24, 2007, the IRS requested documents and information from Mr. Sensenig regarding the bad debt deduction claimed for G-L and LFP. Two days later, Mr. Smith met with the revenue agent

**[*14]** to discuss the IRS's information document request ("IDR"), and at the meeting Mr. Sensenig provided the agent with a one-page written explanation of the "2005 Bad Debt Write Offs". That document stated that the loans for which CLCL claimed a bad debt deduction were to G-L and LFP. During Mr. Sensenig's examination, no companies other than G-L and WSC were mentioned as having deductible bad debts.

On June 21, 2007, the IRS again requested information and documents regarding the claimed bad debt deduction attributable to G-L and LFP, but no documentary information was provided in response to the request. Mr. Sensenig did not provide the IRS with any documentary evidence of the interest rate.

The examination continued, and in 2009 Mr. Sensenig agreed with the IRS that the bad debt deduction was erroneous. Mr. Sensenig said he had been unaware that the bad debt deduction was claimed on CLCL's 2005 return and agreed that it should not have been. (Now, however, Mr. Sensenig maintains that the decision made in 2005 to claim the bad debt deduction was correct because the events that triggered the loss (chiefly, the cease-and-desist order) occurred in 2005.)

The IRS sent Mr. and Mrs. Sensenig a statutory notice of deficiency ("NOD") on May 13, 2011. For 2005 the NOD disallowed CLCL's bad debt

**[\*15]** deduction, attributed the resulting income to the Sensenigs, and determined the resulting deficiency in tax (along with an accuracy-related penalty under section 6662(a)).

## VIII.  Tax Court litigation

After receiving the NOD, the Sensenigs timely filed with the Tax Court in July 2011 a petition for redetermination of the deficiency, the addition to tax, and the penalties in the notice.  When preparing the petition, Mr. Sensenig concluded that CLCL should have deducted in 2005 an additional bad debt, arising not from G-L and LFP but from WSC.

At trial the Court asked Mr. Sensenig to offer into evidence financial information regarding the companies at issue to show that they could not pay the debts to CLCL.  Mr. Sensenig said the only evidence he could provide was "common sense evidence".  That is, he maintains, because the securities regulators shut down his investment activity with the June 2005 cease-and-desist order, he lacked additional funds with which he could keep the companies going, and it was obvious that the companies were therefore doomed and that CLCL's alleged loans to them became worthless.

**[*16]** IX.     Ultimate findings of fact

We find that CLCL's advances to G-L, LFP, and WSC were not loans and that, if they were, they did not become worthless in 2005.

## OPINION

The primary issue for decision is whether the Sensenigs are entitled to a business bad debt deduction for 2005 under section 166(a).  The secondary issue is whether the Sensenigs are liable for the accuracy-related penalty under section 6662(a) for 2005.

I.     Burden of proof

The IRS's determinations are presumed correct; and taxpayers generally bear the burden to prove their entitlement to any deduction they claim, Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933), and they must satisfy the specific requirements for any deduction they claim, INDOPCO, Inc. v. Commissioner, 503 U.S. 79, 84 (1992).  To that end, taxpayers must substantiate each claimed deduction by maintaining records sufficient to establish the amount of the deduction and to enable the Commissioner to determine the correct tax liability.  Sec. 6001; Higbee v. Commissioner, 116 T.C. 438, 440 (2001).  Specifically, in this case, "[t]he burden of proving the reality of * * * indebtedness

[*17] rests on the petitioner." P.M. Fin. Corp. v. Commissioner, 302 F.2d 786, 789 (3d Cir. 1962), aff'g T.C. Memo. 1961-108.

The Court need not accept a taxpayer's self-serving testimony when the taxpayer fails to present corroborating evidence. Beam v. Commissioner, T.C. Memo. 1990-304 (citing Tokarski v. Commissioner, 87 T.C. 74, 77 (1986)), aff'd without published opinion, 956 F.2d 1166 (9th Cir. 1992).

With respect to an individual taxpayer's liability for penalties and additions to tax, section 7491(c) places the burden of production on the Commissioner.

## II.    Bona fide debt deduction

### A.    General principles

A taxpayer is entitled to a deduction for any bona fide debt that becomes worthless within the taxable year. See sec. 166(a)(1); 26 C.F.R. sec. 1.166-1(c), Income Tax Regs. To be able to deduct the reported bad debt for 2005, Mr. Sensenig must show: (1) that the advances made to G-L, LFP, or WSC were debt (not equity); (2) that the debt became worthless[3] in taxable year 2005; and (3) that

---

[3]The Sensenigs did not assert entitlement to a deduction for partially worthless bad debt under section 166(a)(2) in their petition or at trial. The regulations provide that a partially worthless bad debt may be deducted only to the extent that the debt is charged off during the taxable year, see 26 C.F.R. sec. 1.166-3(a)(2), Income Tax Regs., but the Sensenigs presented no evidence that CLCL "charged off" any portion of the purported debt owed by WSC, G-L, or LFP

(continued...)

**[*18]** the debt was incurred not as an investment but in connection with a trade or business (i.e., the business of promoting, organizing, and financing or selling corporations). Because we conclude that Mr. Sensenig failed to prove the first and second of these characteristics, see infra parts II.B and II.C, we need not and do not reach the third.[4]

B.     Debt vs. equity

A bona fide debt arises from "a debtor-creditor relationship based on a valid and enforceable obligation to pay a fixed or determinable sum of money." Kean v. Commissioner, 91 T.C. 575, 594 (1988); 26 C.F.R. sec. 1.166-1(c), Income Tax

[3](...continued)
to CLCL in 2005. For these reasons, and because the Sensenigs failed to prove that the transfers from CLCL to WSC, G-L, or LFP were loans, we do not further address section 166(a)(2).

[4]If CLCL made its advances as an investor and not in the course of a trade or business, see Whipple v. Commissioner, 373 U.S. 193 (1963), then loans it made might yield nonbusiness bad debt. Section 166(d) provides that taxpayers other than corporations may deduct "nonbusiness" bad debts only when they become worthless and then only as short-term capital losses. See sec. 166(d)(1). The Commissioner takes the position that section 166(d) limits an individual taxpayer's deduction of nonbusiness bad debts passed to him through an S corporation (even though the S corporation is a corporation). See Rev. Rul. 93-36, 1993-1 C.B. 187. For the Sensenigs, a short-term capital loss deduction would evidently be limited to $3,000. See sec. 1211(b). Because we determine that CLCL's interests in G-L, LFP, and WSC were not debt and were not worthless, we need not and do not decide the issue of whether (if they had been debt) they would have been nonbusiness debt and whether section 166(d) would apply to limit the deduction.

**[\*19]** Regs. By definition, a capital contribution is not a debt for purposes of section 166. See 26 C.F.R. sec. 1.166-1(c). The question now before us is whether Mr. Sensenig proved that CLCL's advances to G-L, LFP, and WSC were loans (giving rise to debts) or instead were equity investments.

### 1. Frequent complexities

As we will later show, this case is simpler than some debt-vs.-equity cases, but to put this case in context, we describe the field generally. Section 385 addresses the classification of whether an interest in a corporation is debt or equity. The statute authorizes the Secretary to prescribe regulations[5] setting forth factors to be taken into account in resolving the issue, and it provides five factors that "the regulations may include", sec. 385(b) (emphasis added), the first of which is "a written unconditional promise to pay on demand or on a specified date a sum certain in money in return for an adequate consideration in money or money's worth, and to pay a fixed rate of interest",[6] sec. 385(b)(1).

---

[5]The Secretary promulgated final regulations under section 385 in October 2016, but those regulations do not apply to the tax years in issue in this case. See 81 Fed. Reg. 72858 (Oct. 21, 2016).

[6]The other four of the five factors are:

(2) whether there is subordination to or preference over any indebtedness of the corporation,

(continued...)

**[*20]**  In <u>Fin Hay Realty Co. v. United States,</u> 398 F.2d 694, 696 (3d Cir. 1968),

the U.S. Court of Appeals for the Third Circuit, to which a decision in this case

will apparently be appealable, enumerated 16 "criteria by which to judge the true

nature of an investment which is in form a debt":

> (1) the intent of the parties; (2) the identity between creditors and shareholders; (3) the extent of participation in management by the holder of the instrument; (4) the ability of the corporation to obtain funds from outside sources; (5) the "thinness" of the capital structure in relation to debt; (6) the risk involved; (7) the formal indicia of the arrangement; (8) the relative position of the obligees as to other creditors regarding the payment of interest and principal; (9) the voting power of the holder of the instrument; (10) the provision of a fixed rate of interest; (11) a contingency on the obligation to repay; (12) the source of the interest payments; (13) the presence or absence of a fixed maturity date; (14) a provision for redemption by the corporation; (15) a provision for redemption at the option of the holder; and (16) the timing of the advance with reference to the organization of the corporation.

<u>Id.</u>; <u>see also</u> <u>Scriptomatic, Inc v. United States</u>, 555 F.2d 364, 368 (3d Cir. 1977)

(noting that the weight of precedent in the realm of debt-equity determination

flows from the framework of analysis on the basis of the factors enumerated in <u>Fin</u>

---

[6](...continued)
(3)  the ratio of debt to equity of the corporation,
(4)  whether there is convertibility into the stock of the corporation, and
(5)  the relationship between holdings of stock in the corporation and holdings of the interest in question.

Sec. 385(b).

[*21] Hay); Trans-Atl. Co. v. Commissioner, 469 F.2d 1189, 1192 (3d Cir. 1972), aff'g T.C. Memo. 1970-307; M. W. Wood Enters., Inc. v. United States, 538 F. Supp. 974, 975 (E.D. Pa. 1982).

However, in such an analysis no single criterion or group of criteria can "provide a conclusive answer in the kaleidoscopic circumstances which individual cases present." See Fin Hay Realty Co., 398 F.2d at 697. Moreover, the enumerated factors should be used only as aids in analyzing the economic reality of the transaction, that is, whether there is actually a contribution to capital or a true loan for purposes of a bad debt deduction in income tax computation. Id.[7]

The factors outlined in Fin Hay fall roughly into three categories: (1) the intent of the parties; (2) the form of the instrument; and (3) the objective economic reality of the transaction as it relates to the risks taken by investors. See Fuscaldo v. United States, No. 00-CV-2486, 2001 WL 1519684, at *5 (E.D. Pa. Oct. 30, 2001); Fischer v. United States, 441 F. Supp. at 36. We now analyze CLCL's

---

[7]See also Scriptomatic Inc. v. United States, 555 F.2d at 367; Joseph Lupowitz Sons, Inc. v. Commissioner, 497 F.2d 862 (3d Cir. 1974), aff'g in part, remanding in part T.C. Memo. 1972-238; Trans-Atl. Co. v. Commissioner, 469 F.2d at 1192-1193; Dixie Dairies Corp v. Commissioner, 74 T.C. 476, 493-494 (1980) (finding that due to differing factual circumstances under which debt-equity questions arise, where not all the criteria are pertinent, an analysis of a lesser number will suffice); Fischer v. United States, 441 F. Supp. 32, 36 (E.D. Pa. 1977), aff'd, 582 F.2d 1274 (3d Cir. 1978).

**[*22]** advances according to those three categories of factors--form, intent, and economic reality--and we conclude that Mr. Sensenig failed to prove that those advances were bona fide loans rather than contributions to capital or equity investments.

      2.    <u>Analysis</u>

        a.    <u>Form</u>

As the foregoing primer illustrates, much debt-vs.-equity controversy involves ostensible loan instruments that have some characteristics of equity. Those cases require a comparison of the ostensible loan form of a transaction with its arguable equity substance. This case, however, is not one that presents "an investment which is in form a debt", <u>Fin Hay Realty Co.</u>, 398 F.2d at 696, but which may have equity characteristics. Rather, in this case the investment has little or no form. There is no loan agreement providing for repayment of CLCL's advances; there is in fact no written agreement of any sort; and Mr. Sensenig never made any formal demands for repayment.[8] (<u>Fin Hay</u> factors 2 and 3.)

---

[8]Courts have declined to characterize an advance as a genuine loan when the transferor fails to take reasonable measures to secure repayment. <u>Geftman v. Commissioner</u>, 154 F.3d 61, 74 (3d Cir. 1998), <u>rev'g in part, vacating in part</u> T.C. Memo. 1996-447.

[*23] The absence of an unconditional right to demand payment is practically conclusive that an advance is an equity investment rather than a loan for which an advancing taxpayer might be entitled to claim a deduction for a bad debt loss. Secs. 166(a), 385; Fischer v. United States, 441 F. Supp. at 37 (Fin Hay factor 7); Scriptomatic Inc. v. United States, 397 F. Supp. 753, 759 (E.D. Pa. 1975). Thus, courts have found the lack of any formality to be inimical to a contention that a loan exists when there is no provision for interest, no enforceable obligation to repay the funds advanced, no maturity date, and no provision for superiority. Fischer, 441 F. Supp. at 37; see also PepsiCo Puerto Rico, Inc. v. Commissioner, T.C. Memo. 2012-269 (finding that a definite maturity date for payment, without reservation or condition, is a fundamental characteristic of a debt and that if a financial instrument does not provide any means to ensure payment of interest, it is a strong indication of an equity interest).

The salient fact of this case is the lack of written evidence demonstrating that there was a valid and enforceable obligation to repay on the part of any of the companies at issue that received advances from Mr. Sensenig through CLCL. (Fin Hay factor 11.) There is no written evidence of an enforceable obligation between CLCL and any of the companies at issue, much less a provision for a fixed maturity date or a fixed rate of interest. (Fin Hay factors 10 and 13.)

**[\*24]** Mr. Sensenig is not a financially unsophisticated person unaccustomed to having written agreements. On the contrary, his arrangements with those who invested in CLCL's "investor pool" were duly reflected in demand notes that stated rates of interest, and to those lenders he issued quarterly statements and Forms 1099 showing the interest that accrued in their favor. The loans allegedly made by CLCL, however, are undocumented.

Uncorroborated oral testimony is insufficient to satisfy the taxpayer's burden in an equity-versus-debt determination. See Steiner v. Commissioner, T.C. Memo. 1981-212, aff'd without published opinion, 688 F.2d 825 (3d Cir. 1982); Fischer, 441 F. Supp. at 37. The absence of any type of formality typically associated with loans supports the conclusion that the advances were contributions to capital.

### b. Intent

At trial Mr. Sensenig testified that "[t]he intent [of] both sides was that this is a loan and that there would be no profit-sharing. That interest would be paid and only interest would be paid, and that principal and only principal would be repaid." There was, he says, an understanding between the parties that "the borrower will post it as borrowed money and the lender will post it as money

[*25] loaned out"; and consistent with that, Mr. Sensenig offered CLCL journal entries that labeled some advances as loans.

However, for only one of the companies at issue, WSC, did Mr. Sensenig provide even shareholders' and directors' resolutions authorizing WSC to borrow from CLCL; and even in that instance, there is no further documentation to demonstrate that thereafter the authority was actually exercised and a loan was in fact made to WSC, or that WSC had an obligation to repay such a loan. Instead, Mr. Sensenig stated that on behalf of CLCL he entered into oral agreements with G-L, LFP, and WSC to lend money (lines of credit) and that those companies agreed to borrow the same amounts. But apart from his testimony, there is no evidence in the record that reflects that CLCL or any of the companies at issue treated the monetary advances from CLCL as draws on lines of credit, other than the aforementioned (scattered) journal entries of CLCL.

"[C]onclusory declarations that the parties intended to create debts should carry little weight." Fischer, 441 F. Supp. at 37; see also Dunmire v. Commissioner, T.C. Memo. 1981-372. The Court provided Mr. Sensenig with the opportunity to present evidence to corroborate his testimony, but he was unable to do so.

**[\*26]** "In the absence of direct evidence of intent, the nature of the transaction may be inferred from its objective characteristics". Geftman v. Commissioner, 154 F.3d 61, 68 (1998), rev'g in part, vacating in part T.C. Memo. 1996-447.[9] In this case, we meet again the blunt, objective fact that no loans are documented.

c.     Economic reality

The third category of factors pertains to the economic reality of the advances. "A court may ascertain the true nature of an asserted loan transaction by measuring the transaction against the 'economic reality of the marketplace' to determine whether a third-party lender would extend credit under similar circumstances." Id. at 76 (quoting Scriptomatic, Inc., 555 F.2d at 367-368).

If an outside lender would not have lent funds to the corporation on the same terms as did the insider, an inference arises that the advance is not a bona fide loan. See Fin Hay Realty Co., 398 F.2d at 697; Fischer, 441 F. Supp at 38 ("The acid test of the economic reality of a purported debt is whether an unrelated outside party would have advanced funds under like circumstances").

---

[9]Such objective characteristics may include "the presence or absence of debt instruments, collateral, interest provisions, repayment schedules or deadlines, book entries recording loan balances or interest payments, actual repayments, and any other attributes indicative of an enforceable obligation to repay the sums advanced." Geftman v. Commissioner, 154 F.3d at 68.

[*27] Mr. Sensenig stated that the companies he chose to finance were start-up ventures that could not obtain financing from unrelated banks. (Fin Hay factor 4.) As a matter of CLCL policy, if a start-up company had other sources or means to borrow, CLCL would not advance money to it. (And other than the money that CLCL provided to the companies, no further capital contributions were made by anyone else.) The three companies at issue were objectively risky debtors, and an unrelated prospective lender would probably have concluded that they would likely be unable to repay any proposed loan.

Mr. Sensenig emphasized that, with respect to the advances at issue here, he generated no formal written financial projections and that he did not know what those projections would be. He was satisfied to go with the "gut feel of everybody involved". He considered business plans a waste of time and emphasized the importance of being able to "turn on a dime" on the basis of the facts of the moment, unconstrained by any formal plan. We think an unrelated lender would have considered this approach too cavalier.

When Mr. Sensenig decided to write off the advance to LFP, it was because he believed the possibility the company would be profitable was remote.[10] And

---

[10]Specifically for LFP, Mr. Sensenig did not believe any revenue generated from the patent to polish rebar would be sufficient to repay the debt.

[*28] yet CLCL continued to provide financing (of approximately $9 million) to all three companies after the year 2005 for which the bad debt deduction was claimed. No prudent lender would have continued to advance money to any of these companies under such circumstances. Here, the amounts advanced to G-L, LFP, and WSC were, as a matter of economic reality, placed at the risk of the businesses and more closely resembled venture capital than loans. (Fin Hay factor 6.) Steiner v. Commissioner, T.C. Memo. 1981-212 (where advances are placed at the risk of the business, they are typically viewed as contributions to capital rather than loans).

Since Congress has chosen to give different tax consequences to debt and equity, it "would do violence to the congressional policy" to treat as debt a purported loan that "is so risky that it can properly be regarded only as venture capital." Fischer, 441 F. Supp. at 38 (quoting Gilbert v. Commissioner, 248 F.2d 399, 407 (2d Cir. 1957), remanding T.C. Memo. 1956-137).

To the same effect, an advance may have the economic substance of a loan where the funds are advanced with a reasonable expectation of repayment regardless of the success of the venture or are placed at the risk of the business. Steiner v. Commissioner, T.C. Memo. 1981-212. Mr. Sensenig's expectation of repayment to CLCL, however, was completely dependent on the future financial

[*29] success of the companies (which were not successful).  See Scriptomatic, Inc., 397 F. Supp. at 764 (holding advances were not debt where repayment "can only be reasonably assured by the chance of profits or from the liquidation of the business").  Repayment of any amount advanced by CLCL to one of the companies was not anticipated until the project had been "completed".  Moreover, as to WSC, any expectation of repayment was even more remote, given that CLCL's interest was necessarily subordinate to the interest of WSC's prior mortgage lender.  (Fin Hay factor 8.)

Also at odds with a conclusion that this was a genuine loan transaction is Mr. Sensenig's not charging any loan origination fees for the advances and his lack of interest in obtaining third-party audits, financial statements, or credit reports for the companies he had chosen to invest in.

CLCL's advances simply do not have the appearance of loans.  We believe that no reasonable third-party lender would have extended money to these companies when none of the objective attributes which denote a bona fide loan are present, including a written promise of repayment, a repayment schedule, and security for the loan.

The transfers simply did not give rise to a reasonable expectation or enforceable obligation of repayment.  For these reasons, we find that the

[*30] relationship between Mr. Sensenig and CLCL on the one hand and the three companies on the other was not that of creditor and debtor, and we conclude that Mr. Sensenig's advances of CLCL funds were in substance equity and that the IRS properly disallowed the deduction for tax year 2005.

## C. Worthlessness

The Sensenigs' contention of worthless debt fails also because they did not show the extent to which the supposed debts were indeed worthless in 2005. We accept that the 2005 cease-and-desist order was a major harmful event for CLCL and the companies in which it invested; but whether and when that event caused worthlessness was not demonstrated. Over the time that this controversy has been pending between the IRS and Mr. Sensenig, he has been inconsistent with regard to whether claiming the bad debt deduction for 2005 was proper and which company was the debtor. (Fin Hay factor 1.) The 2005 Form 1120S that Mr. Sensenig filed for CLCL does not identify the source of the bad debt deduction. During the IRS's examination, Mr. Sensenig and his accountant, Mr. Smith, stated that the 2005 bad debt deduction was claimed by CLCL for loans to G-L and LFP. (This position was consistent with CLCL's general ledger for 2005, on which the total bad debt included a complete write-off by CLCL of the advances to G-L and

[*31] LFP, and yet CLCL continued to advance funds to both companies in subsequent years.)

However, later in the examination and also in his petition, Mr. Sensenig conceded the bad debt deduction and explained that he "was in fact surprised that his bookkeeper had claimed it and admits that he missed the error when signing the tax return." No other companies were discussed during the examination.

Later in his petition, contradicting himself yet again, Mr. Sensenig included a handwritten page (which he referred as a "footnote") stating that "the years following 2005 events have proven that the bad debt as claimed in 2005 was correct after all and should have been allowed as filed." Mr. Sensenig now maintains that the bad debt was related to the advances made to WSC and not only to G-L or LFP; but there is no documentary evidence that CLCL wrote off any portion of the WSC debts in 2005 on its books; and after the 2005 bad debt deduction, WSC was still in operation. (Likewise, as of May 2007, G-L and LFP were still receiving funding from CLCL to pay for business operations.)

Given Mr. Sensenig's shifting position about who owed the supposed bad debts and whether those debts had become worthless, we cannot give much weight to his testimony about worthlessness. More important, he put on no evidence as to the financial condition of the three "borrower" companies as of December 31,

**[\*32]** 2005, the end of the remaining year at issue. The Sensenigs did not carry their burden to prove that any debts were worthless in 2005, and we will sustain the IRS's disallowance of the bad debt deductions.

III.    Accuracy-related penalty

A taxpayer is liable for an accuracy-related penalty as to any portion of an underpayment attributable to, among other things, a substantial understatement of income tax or negligence. Sec. 6662(a) and (b)(1) and (2). There is a substantial understatement of income tax if the amount of the understatement exceeds the greater of 10% of the tax required to be shown on the return or $5,000. Sec. 6662(d)(1)(A); 26 C.F.R. sec. 1.6662-4(a), Income Tax Regs.

The Commissioner bears the burden of production with respect to this penalty. Sec. 7491(c). The IRS's NOD, which made determinations we have sustained, determined an underpayment due to an understatement of income tax in excess of both $5,000 and 10% of the total tax required to be shown on petitioner's 2005 return. And even if the amount of the deficiency is recomputed under Rule 155, it is clear that the understatement will remain "substantial" for purposes of section 6662(a)(1)(A). The Commissioner has thus carried his burden of production by demonstrating a "substantial understatement of income tax."

[*33] Once the Commissioner has met the burden of production, the taxpayer must come forward with persuasive evidence that the penalty is inappropriate because, for example, he or she acted with reasonable cause and in good faith. Sec. 6664(c)(1); Higbee v. Commissioner, 116 T.C. at 448-449. The decision as to whether a taxpayer acted with reasonable cause and in good faith is made on a case-by-case basis, taking into account all pertinent facts and circumstances. See 26 C.F.R. sec. 1.6664-4(b)(1). Generally, the most important factor is the extent of the taxpayer's effort to assess her or his proper tax liability. Id.; see also Shaw v. Commissioner, T.C. Memo. 2013-170, aff'd, 623 F. App'x 467 (9th Cir. 2015); Halby v. Commissioner, T.C. Memo. 2009-204. Other circumstances include the experience, knowledge, and education of the taxpayer, as well as the extent to which the taxpayer reasonably and in good faith relied on the advice of a competent professional tax adviser. 26 C.F.R. sec. 1.6664-4(c)(1); see Neonatology Assocs., P.A. v. Commissioner, 115 T.C. 43, 99 (2000), aff'd, 299 F.3d 221 (3d Cir. 2002).

When asked at trial to provide any argument as to why he should not be held liable for the penalty, Mr. Sensenig stated: "If I owe the tax, I owe the penalty in my opinion." We agree. Mr. Sensenig does not rely on a claim of reliance on advice; rather, he takes full responsibility for the information reported on the

[*34] return and does not attribute any fault to his C.P.A. employee who prepared CLCL's 2005 tax return. Because Mr. Sensenig was a long-time licensed public accountant and owner of an accounting practice--which at one point prepared over 300 returns per year--his professional experience should have prompted more of an effort on his part to ensure that his bad debt deduction was proper. His uncertainty as to which companies' debts warranted the bad debt deduction and his surprise at learning which companies' debts had been relied on to support the deduction demonstrate a lack of a diligent effort to ascertain the validity of the tax deduction.

Under these circumstances, we sustain the IRS's determination of the accuracy-related penalty.

To reflect the foregoing,

Decision will be entered under

Rule 155.